UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JAMES CHAMNESS, )<br>     Plaintiff, )<br>)<br>-v- )<br>)<br>LIBERTY LIFE ASSURANCE COMPANY OF )<br>BOSTON and THE SPECTRUM HEALTH )<br>LONG TERM DISABILITY PLAN, )<br>     Defendants. )<br>                ) | No. 1:13-cv-301<br><br>Honorable Paul L. Maloney |

### OPINION AND ORDER REVERSING DECISION TO DENY LONG TERM DISABILITY BENEFITS

Plaintiff James Chamness, M.D., filed a complaint under the Employee Retirement Income Security Act (ERISA). Chamness alleges that his application for long-term disability benefits was improperly denied by Defendant Liberty Life, the fiduciary of the employee welfare benefit plan provided by his employer. Chamness claims to suffer from both physical and mental disabilities. The Court has conducted a *de novo* review of the record and reverses the decision by Liberty Life to deny Chamness's claim for long term disability benefits.

I.

ERISA protects and promotes the interests of employees and their beneficiaries in employee benefit plans. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989). Among its provisions, ERISA allows participants and beneficiaries to file civil actions seeking a review of the denial of benefits. *See* 29 U.S.C. § 1132(a)(1)(B). The standard of review employed by the court in an ERISA civil action typically depends on the language in the

benefit plan. Ordinarily, a court will review the denial of benefits challenged under § 1132(a)(1)(B) using the *de novo* standard. *Firestone Tire and Rubber*, 489 U.S at 115. However, when the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court reviews the denial of benefits using the arbitrary and capricious standard. *Id.*

The Court reviews the decision challenged in this case using the *de novo* standard of review. In 2007, the State of Michigan's Office of Financial and Insurance Services (OFIS) promulgated a rule prohibiting insurers from issuing contracts or policies that contain discretionary clauses. *American Council for Live Ins. v. Ross*, 558 F.3d 600, 602-03 (6th Cir. 2009); *see* Mich. Admin. Code R. 500.2201(c) and 550.2202(b). The Sixth Circuit Court of Appeals upheld the rule, concluding that the rule was not preempted by ERISA. *Id.* at 609. Both parties agree that, as required by the OFIS Rules, this Court must review the decision denying Chamness's benefits under the *de novo* standard. (ECF No. 15 Pl. Br. PageID.950; ECF No. 19 Def. Br. PageID.979.)

Under the *de novo* standard, the federal court must determine if the administrator or fiduciary made the correct decision. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). The decision is reviewed without deference and the administrator's decision is afforded no presumption of correctness. *Id.* The reviewing court may consider only the evidence presented to the administrator or fiduciary prior to the final decision. *Id.* at 967.

II.

Chamness is a board-certified pediatrician. He earned his medical degree in 1987. In 2007, Chamness entered into a one-year pediatric sleep fellowship at a hospital in

2

Chicago, Illinois. Then, in September 2008, he began working for Spectrum Health at the Helen DeVos Children's Hospital in Grand Rapids, Michigan as a pediatric sleep specialist. Spectrum Health sponsors a Group Disability Income Policy for its employees through Defendant Liberty Life. (*See* ECF No. 11-1 Plan PageID.41.) While employed by Spectrum, Chamness was covered by the disability plan. (ECF No. 1 Compl. ¶ 4.)

Chamness's last day of work was May 10, 2011. (Compl. ¶ 10.) On October 15, 2011, Chamness submitted a claim for long-term disability benefits. (ECF No. 13-5 PageID.811.) In a letter dated January 6, 2012, Liberty Life denied Chamness' application for long-term disability benefits. (ECF No. 11-3 Initial Denial PageID.152-55.) The letter stated that any appeal must be sent within 180 days. Through counsel, Chamness filed his appeal on June 27, 2012. (ECF No. 12-5 Appeal PageID.573-605.) The appeal was denied in a letter dated October 11, 2012. (ECF No. 11-2 Final Denial PageID.108-13.) The complaint was timely filed on March 20, 2013

### III.

### A.

For Chamness to succeed on his claim for benefits under ERISA, he must prove by a preponderance of the evidence that he was "disabled," as that term is defined in his employee benefits plan. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. of LBA Employees*, 741 F.3d 686, 700-01 (6th Cir. 2014) (citations omitted). Spectrum Health's Group Disability Income Policy (Plan) defines "disability" or "disabled."

> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>    a. if the Cover Person is eligible for the Maximum Own Occupation benefit, "Disability" or "Disabled" means during the Elimination Period until

  the Cover Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.
   b. i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
    ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(Plan PageID.50.) The Plan defines the phrase "own occupation" as the individual's "occupation that he was performing when his Disability or Partial Disability began. For the purpose of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." (*Id.* PageID.53.) When the disability arises due to mental illness, the benefits "will not exceed a combined period of 24 months of Monthly Benefit payments, while the Covered Person is insured under this policy." (*Id.* PageID.67.)

### B. Physical Disability

Chamness alleges he is entitled to long-term disability benefits for physical limitations. Chamness asserts he is physically disabled because of coronary artery disease and sleep apnea. Chamness also notes he has been diagnosed with asthma, irritable bowel syndrome, and gastroesophageal reflux disease.

Chamness first experienced heart problems in May 2009. He was then diagnosed with heart disease and had surgery to place a stent to open the left anterior artery. Chamness visited hospitals for chest pain twice since the stent was placed, once in October 2009 and then again in June 2011. His medical records indicate that, by February 2011, Chamness

had been diagnosed with heart disease, irritable bowel syndrome, gastroesophageal reflux disease, and asthma.  (ECF No. 12-5 PageID.524.)  In November 2011, after his separation from Spectrum Health, Chamenss was diagnosed with sleep apnea.  (ECF No. 12-3 PageID.466-75.)

Chamness did not list any physical disability on his claim for long-term benefits.[1]  (ECF No. 13-5 PageID.811-13.)  In its initial denial of benefits, Liberty Life addressed Chamness's disability claim as one based on depression.  (Initial Denial PageID.152.)  As part of his appeal, Chamness identified both coronary artery disease and sleep apnea as medical conditions that support his claim for disability benefits.  (Appeal PageID.583.)  Chamness lists both mental and physical disabilities as a reason for benefits in the complaint filed here.  (Compl. ¶ 9.)

The record does not support the conclusion that Chamness suffers a physical disability that prevents him from performing the duties of his own occupation.  On his application for long-term disability benefits, Chamness listed his physicians, including David Wohns, M.D. (cardiologist) and Jason Coles, M.D. (sleep specialist).  (ECF No. 13-5 PageID.813.)  Liberty Life then contacted those two doctors and requested Chamness's medical records.[2]  On October 24, 2011, Dr. Wohns completed an attending physician's assessment of capacity and did not place any significant restrictions on Chamness that would have prevented him from performing his job.  (ECF No. 13-4 PageID.776-77.)  Dr. Wohns

---

[1] Chamness states that his depression symptoms worsened following a coronary artery event. (PageID.813.)  He did not list the heart problem as a distinct basis for long term disability benefits.
[2] Chamness also listed John Scott, M.D.  When contacted by Liberty Life, Dr. Scott indicated that, as he understood Chamness's claim, the disability was psychiatric.  (ECF No. 13-5 PageID.816.)  Dr. Scott stated that he did not participate in Chamness's psychiatric treatment.  (*Id.*)

5

noted that Chamness himself stated that his "restrictions are primarily psychological[.]" (*Id.* PageID.777.) Dr. Coles completed his attending physician's assessment of capacity on November 9, 2011. (ECF No. 13-3 PageID.727-28.) Dr. Coles stated that Chamness's sleep disorders generally worsen his cognitive abilities and affected his work performance, but the sleep disorders did not require any specific physical limitations, "other than no driving if excessively sleepy." (*Id.* PageID.728.)

After benefits were denied and Chamness requested an administrative review or appeal, Liberty Life sought an additional review of Chamness's medical records from Ankush Bansal, M.D. Dr. Bansal reviewed Chamness's extensive medical records and concluded that Chamness was "not impaired from working as a physician from a medical, non-psychiatric standpoint." (ECF No. 11-2 PageID.143.) Dr. Bansal discussed some of the medications Chamness was taking, and concluded that the record did not show any "clear evidence" that Chamness's cognitive deficits were related to the medications. (*Id.* PageID.142.)

In his brief, Chamness does not identify any place in the record where a doctor opines that he cannot perform the duties of his own occupation because of his physical ailments. At best, Dr. Dumerauf concludes that Chamness's physical maladies exacerbated his mental health problems. (ECF No. 11-4 PageID.224.) In contrast, Liberty Life points to reports from Chamness's cardiologist, Dr. Wohns, and his sleep expert, Dr. Coles. Neither of those doctors concluded that Chamness was physically unable to perform his duties. That conclusion is reinforced by the file review performed by Dr. Bansal.

6

Accordingly, Chamness has not established that he suffers a physical disability such that he would be entitled to long-term benefits under the Plan.

C. Mental Disability

Chamness also alleges he is entitled to long-term disability benefits for a mental disability. Chamness insists he is disabled as a result of depression and anxiety. Chamness argues that his psychological impairments limit his ability to concentrate and cause memory problems.

Chamness has a history of depression and anxiety, which were controlled by medication. (ECF No. 11-4 PageID.231.) In July 2009, Chamness was seen by James Dumerauf, a board-certified psychiatrist. Chamness self-reported that he had long suffered from depression and anxiety and was being treated by his primary care physician. Chamness had been experiencing additional stressors over the previous six to eight months and wanted a second look at his medications. (ECF No. 11-4 PageID.231.) In Initial Assessment Form, Dr. Dumerauf stated that his impression of Chamness included, for Axis I, "[m]ajor depression, recurrent, mild, without psychosis; anxiety not otherwise specified."[3] (*Id.* PageID.233.) Dr. Dumerauf included, for Axis II, "obsessive compulsive personality traits." (*Id.*) Dr. Dumerauf continued treating Chamness with regular sessions, usually monthly, for the next several years. (ECF No. 11-4 Dumerauf Notes PageID.234-57.) Beginning in

---

[3] There are five axes in the DSM-IV multiaxial classification scheme. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR 27 (4th ed. 2000). The "multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinical plan treatment and predict outcome." *Id.* Axis I identifies clinical disorders and other conditions that may be a focus of clinical attention. Axis II identifies personality disorders and mental retardation.

7

February 2010, Chamness also began regular psychotherapy sessions with R. Craig Koch, M.S.W. (Koch Notes PageID.406-40.)

When he first visited Dr. Dumerauf, Chamness identified a number of factors that were creating stress in his life, which were all exacerbating his depression and anxiety: family concerns, his recent heart problems, the transition to a new job, and his preparation to take a board examination for the new specialty. (Dumerauf Notes PageID.231-32.) As a result of these stressors, and in part because of perfectionist tendencies, Chamness was getting behind in his patient evaluations, which was also creating stress. (*Id.* PageID.232.) In February 2010, Chamness complained of the same stressors to his therapist, Koch. (Koch Notes PageID.409.) As he reported to his psychiatrist and his therapist, Chamness's stress levels waxed and waned over the next year or so, at least in part because of his physical health. For example, in July 2010, Chamness's asthma and allergies grew worse, which necessitated a higher dose of steroids to control the symptoms. (ECF No. 12-1 PageID.348.) However, the health complications and medications elevated his stress levels as his work was affected. (ECF No. 12-4 PageID.515; Koch Notes PageID.420.)

Chamness's backlog of paperwork was a constant source of stress and anxiety. In late April or early May 2011, Chamness learned that he might be terminated because of his productivity problems, which increased his stress and anxiety. (Dumerauf Notes PageID.242; Koch Notes PageID.426.) On or before May 9, 2011, Chamness was given a thirty-day ultimatum at work to get caught up with his backlog or he would be terminated, which affected his stress and anxiety levels. (Dumerauf Notes PageID.243; Koch Notes PageID.427.) May 10 was Chamness's last day of work.

8

In his claim for long-term benefits, Chamness described his symptoms as "[s]tress, anxiety, and depression, along with my other health issues, lead to chronic tiredness, low energy, tiring easily, inability to concentrate, missing details, slow mental processing, trouble with memory and word recall, and trouble working quickly and efficiently." (ECF No. 13-5 PageID.813.) Liberty Life concluded that the record did not support the conclusion that Chamness's depressive and anxiety symptoms would preclude him from performing the duties of his occupation. (Initial Denial PageID.154.) In his appeal, Chamness identified both major depressive disorder and anxiety as medical conditions that supported his claim for mental disability benefits. (Appeal PageID.583.)

Chamness and Liberty Life offer competing psychiatric opinions which reach different conclusions about Chamness's mental abilities. For disability determinations under employee benefit plans, plan administrators need not afford any special deference to the opinions of the claimant's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Plan administrators bear no "discrete burden of explanation" when they rely on credible evidence that conflicts with a treating physician's evaluation. *Id.* at 834. At same time, plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, which may include the opinion of his or her treating physician. *Id.*; *see Shaw v. AT&T Umbrella Benefits Plan No. 1*, 795 F.3d 538, 548-49 (6th Cir. 2015) (holding that a plan administrator may not simply ignore evidence presented by the claimant and which supported the treating physician's opinion and, in such situations, must provide a reason for adopting a different opinion) (citations omitted).

9

Chamness relies on Dr. Dumerauf's assessment as evidence of Chamness's disability. In December 2011, Dr. Dumerauf completed an attending physician's statement. (ECF No. 11-4 PageID.226-28.) Dr. Dumerauf's primary diagnosis of Chamness was "major depression, recurrent, severe." (*Id.* PageID.226.) In the space for other activities that are limited, Dr. Dumerauf wrote "practice of medicine due to impaired concentration and fatigue." (*Id.* PageID.228.) The form provides a space for psychiatric impairments, and asks the doctors to identify "the degree to which the patient is able to perform the duties of their occupation." (*Id.* PageID.229.) Of the five possibilities, Dr. Dumerauf checked "Class 4 – Marked Limitations: Patient is unable to engage in stress situations or engage in interpersonal relations." (*Id.*)

Liberty Life relies on reports issued by several doctors who conducted file reviews. After receiving Chamness's claim, Liberty Life sent Chamness's medical records to Andrew Brown, M.D., for an independent review. Dr. Brown is a board-certified psychiatrist. Dr. Brown explained that Chamness suffers from obsessive-compulsive personality traits. (ECF No. 13-2 Brown 12/20/11 Report PageID.637.) Because those personality traits are part of Chamness's baseline functioning, they should not preclude Chamness from performing the duties of his own occupation. (*Id.*) Those personality traits might, however, interfere with Chamness's ability to function up to an employer's expectations at a particular job site. (*Id.*)

Dr. Brown concluded that Chamness's records did not support the conclusion that his symptoms of depression or anxiety would preclude him from performing the duties of his own occupation beyond November 9, 2011. (Brown 12/20/22 Report PageID.636.) Dr. Brown provided several pages of analysis. (*Id.* PageID.643-48.) Essentially, Chamness's

10

obsessive-compulsive personality traits undermined his ability to function in a manner that met the expectations of this employer.  Dr. Brown points to three facts that are inconsistent with the conclusion that Chamness is unable to perform the duties of his occupation: (1) aspects of life not related to work, (2) current lack of severe or impairing levels of anxiety or depression, and (3) nature and intensity of current treatment.  (*Id.* PageID.647-48.)  Dr. Brown notes, several times, that Chamness "elected" (*Id.* PageID.636) or made a "choice" (*Id.* PageID.647) to claim incapacity only after he was given an ultimatum at work.  After speaking with Dr. Dumerauf, Dr. Brown drafted a shorter memorandum in which he reached the same conclusion.  (ECF No. 13-1 PageID.628-29.)

After the initial request for long-term benefits was denied and the appeal was filed, both Chamness and Liberty Life sought additional medical opinions.  In July 2012, Chamness was interviewed by Michael Wolff, Psy.D., a licensed psychologist, who produced a report.  (ECF No. Wolff Report 551-54.)  Dr. Wolff noted that Chamness has been struggling with anxiety and acute-stress like reactions that started in 2008 and have since progressed.  (*Id.* PageID.551.)  One purpose of the consultation was to get a better understanding of "his possible memory loss versus stress-related decline." (*Id.* PageID.552.)  Dr. Wolff concluded that the changes to Chamness's functional abilities were closely associated with his efforts to become a pediatric sleep specialist.  (*Id.* PageID.553.)  Dr. Wolff wrote that when Chamness is placed in pressure situations he loses focus, memory and organization.  (*Id.*)  Ultimately, Dr. Wolff concluded that Chamness was "unprepared to return to work.  There are too many risks that continue to be evident and would preclude safety in patient care." (*Id.* PageID.553-54.)

11

Liberty Life referred Chamness's file to Lyle Forehand, M.D. a board-certified psychiatrist. Dr. Forehand issued an initial report on September 4, 2012. (ECF No. 12-5 Forehand September 2012 Report PageID.541-46.) Dr. Forehand concluded that the records provided no support for the conclusion that Chamness could not perform the duties of his occupation. Dr. Forehand concluded that Chamness reported a "[c]linically significant cognitive impairment" after receiving a termination threat at work, and that impairment "had significantly improved" by September 2011. (PageID.544.) Dr. Forehand noted that Chamness never reported a cognitive impairment to Koch. (*Id.*) Dr. Dumerauf attempted only one treatment with a low dose of a drug. (*Id.*) No testing was done. (*Id.*) Finally, Dr. Forehand found no evidence to connect Chamness's cognitive impairment with depression or anxiety. (*Id.* PageID.544 and 545.) Although Dr. Forehand found Chamness should be able to function as a physician, he conceded that Chamness should not return to the job he left. (*Id.* PageID.544.) Subsequent to his first report, Dr. Forehand submitted two additional reports, both of which addressed additional information. (ECF No. 11-2 Forehand Oct 3, 2012 Supplement PageID.124-28; ECF No. 11-2 Forehand Oct 8, 2012 Supplement PageID.115-17.) Dr. Forehand found no reason to alter his initial conclusions.

Liberty Life also sent Chamness's medical file for an occupational analysis review. (ECF No. 12-5 PageID.557-563.) The consultant considered the job description provided by Spectrum Health, and concluded that the most analogous description from the Dictionary of Occupational Titles was Family and General Practitioner. (PageID.557.) The consultant concluded that this position required "high levels of concentration, focus, memory, problem-solving, etc. in accomplishing the tasks with which they are charged." (PageID.562.)

Having performed a de novo review of the record, the Court concludes that Chamness is entitled to long term disability benefits for mental disability. The record does not support Liberty Life's decision to deny mental disability benefits.

First, for the purpose of his disability claim, Chamness's "own occupation" is that of a general or family practitioner. In his appeal of the initial denial of benefits, Chamness outlines the duties of his position, as described by Spectrum. (Appeal PageID.578-79.) The responsibilities and duties described in the appeal letter are consistent with the summary provided in the occupational analysis. The evidence in the medical record, largely the conclusions of Dr. Dumerauf and Dr. Wolff, support the conclusion that, when he applied for long term disability benefits, Chamness could not maintain high levels of concentration and focus and he had problems with his memory. Those opinions support the conclusion that Chamness could not perform the duties of his own occupation.

Contrary to Chamness's argument, the decision and reasoning in *Rabuck v. Hartford Life and Accident Ins. Co.*, 522 F.Supp.2d 844 (W.D. Mich. 2007) does not control this situation. In *Rabuck,* the plan administrator terminated the long term benefits it had previously granted. Judge Scoville summarized the Sixth Circuit's holdings, which placed the burden on the administrator to show (1) the type of job the administrator believes the claimant is capable of performing and (2) that it made a sufficient inquiry that the claimant could perform the jobs identified in light of the claimant's functional limitations. *Id.* at 875 (citations omitted). Here, Liberty Life denied benefits; it did not terminate existing benefits. The burden is on Chamness to prove his eligibility for long term benefits.

Second, all of the psychiatrists who met with Chamness concluded that he could not return to employment. Dr. Dumerauf has submitted at least three separate evaluations of Chamness's mental status. On October 11, 2011, Dr. Dumerauf completed Liberty's form titled "Functional Mental Capacity Evaluation." (ECF No. 14-1 PageID.856-58.) In the space under the question "In what way do the above symptoms interfere with the person's ability to function in a work setting?," Dr. Dumerauf wrote "[illegible], anxious, decreased intellectual stamina and decreased stress tolerance secondary to depression and anxiety." (PageID.857.) In the space under the question "What functional abilities are still retained?," Dr. Dumerauf wrote "patient is intellectually intact but ability to perform as a physician impaired due to depression/anxiety." (*Id.*) In December 2011, Dumerauf completed an attending physician's statement and, in the space asking what activities are limited, he wrote "practice of medicine [due] to impaired concentration and fatigue." (ECF No. 11-4 PageID.228.) Finally, in June 2012, Dumerauf signed a document titled "Physician Statement of Disability," in which he wrote that, in his medical opinion, "Dr. Chamness is totally disabled from all full time work at this time." (ECF No. 11-4 PageID.224.) Dr. Wolff reached a similar conclusion in July 2012, underscoring the significance of the potential consequences should Chamness return to the practice of medicine.

> This resulted in the need for him to take medical leave in May 2011. He has worked diligently to try to manage this stress reaction, but any time he has been put under pressure recently he continues to quickly lose focus, memory, and organization. He is incredibly stress sensitive. This stress reactivity is something that cannot be easily managed in his career. In fact, I think it would be detrimental to patient care and could potentially open the door for ethical and/or legal charges depending on the circumstance for how this stress would influence patient care.

14

(ECF No. 12-5 PageID.553.)

In contrast, all of the opinions on which Liberty Life relied were based on file reviews. This, by itself, weighs against Liberty Life's decision. The Sixth Circuit has held that there is "nothing inherently objectionable about a file review conducted by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). When reviewing a benefits determination, courts may consider whether a doctor has physically examined the claimant. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005); *Calvert*, 409 F.3d at 295.

The Sixth Circuit has, however, recognized that "[f]ile reviews are particularly 'questionable as a basis' for an administrator's determination to deny benefits where the claim, as here, involves a mental illness component." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016) (quoting *Javery v. Lucent Techns. Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014)); *see Smith v. Bayer Corp. Long Term Disability Plan*, 444 F.Supp.2d 856, 873 (E.D. Tenn. 2006) *affirmed in part and reversed in part* 275 F'App'x 495, 503-04 (6th Cir. 2008). Psychiatrists generally rely on self-reporting to diagnose and treat subjective complaints. *See James v. Liberty Live Assurance Co. of Boston*, 582 F.App'x 581, 588 (6th Cir. 2014); *Brainard v. Liberty Live Assurance Co. of Boston*, 173 F.Supp.3d 482, 488 (E.D. Ky. 2016) ("File reviews by psychiatrists are viewed as particularly suspect since psychiatrists usually treat subjective, instead of objective, symptoms."); *see also Hartman v. Bowen*, 636 F.Supp.129, 131-32 (N.D. Cal. 1986) ("Psychiatric impairments are not as readily amenable to substantiation by objective laboratory testing as are medical impairments and consequently,

15

the diagnostic techniques in the field of psychiatry may be less tangible than those in the field of medicine."). Accurately assessing the mental health of an individual, therefore, generally requires "'interviewing the patient and spending time with the patient,' such that a purely record review will often be inadequate where a disability claim includes a mental component." *Okuno*, 836 F.3d at 610 (quoting *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F.App'x 495, 508 (6th Cir. 2008)).

Third, the file review performed by Dr. Brown fails to address Chamness's diminished ability to concentrate and his impaired memory. Dr. Dumerauf, in his October 2011 mental status evaluation and again in his December 2011 physician's statement, identified Chamness's problems with concentration and memory as impairments secondary to depression that prevented Chamness from working as a doctor. In Dr. Brown's December 2011 report, he acknowledged this self-reported symptom (PageID.638), but neglected to discuss the symptom in his assessment of Chamness's mental abilities. Instead, Dr. Brown repeatedly discusses Chamness's separation from his position, not because of a disability, but as a choice.[4] Dr. Brown reasoned that Chamness's obsessive compulsive personality, in combination with the rigorous demands of the hospital, lead to Chamness's decision to leave his position. Dr. Brown concluded that Chamness's situation was not explained by the presence of a severe impairment that prevents him from working. But this

---

[4] For example, Dr. Brown states that Chamness "elected to claim work incapacity" (PageID.636), "decided to stop working as a direct response to his employer's moves" (PageID.645), and "the insured's choice to address his untenable job situation by claiming work incapacity" (PageID.647).

16

explanation is not consistent with the persistent focus, concentration and memory problems Chamness's treating physician had noted.

Dr. Forehand does address those diminished abilities, but dismissed Chamness's claims. Dr. Forehand was asked if the medical evidence supports Chamness's complaints of an inability to concentrate and memory problems. (Forehand September 2012 Report PageID.544.) Dr. Forehand concluded that the record demonstrated improvements in this area by September 2011. He also concluded that Chamness's complaint were likely related to sleep problems and were not related to depression or anxiety related to the job. Dr. Forehand wrote that there was no other treater who evaluated Chamness's claims and no medical evidence other than Chamness's self reports. (PageID.545.) In his supplemental report, Dr. Forehand briefly summarized Dr. Wolff's assessment, but found no reason to change his conclusions. (Forehand Oct. 8, 2012 Report PageID.117.)

Dr. Forehand's either ignores or misstates the record. In the same notes that Dr. Forehand cited for Chamness's improvement, Dr. Dumerauf wrote that Chamness was "not sufficiently well – stable to return to work at this point." (Dumerauf Notes PageID.249.) And, Dr. Forehand's selective quotations were not limited to this one instance. In his report, Dr. Forehand states that, on October 11, 2011, Dr. Dumerauf "reported the claimant to be 'intellectually intact.'" (Forehand September 2012 Report PageID.544.) Dr. Dumerauf statement must be taken in context; he wrote "patient is intellectually intact but ability to perform as a physician impaired due to depression/anxiety." (ECF No. 14-1 Functional Mental Status Evaluation PageID.857.) Dr. Forehand noted, on several occasions, that Chamness had not produced any documentation to support his loss of concentration and

17

focus or his memory problems. (Forehand Oct. 3, 2012 Report PageID.127; Forehand Sept. 2012 Report PageID.545.) But the Plan does not require objective medical evidence for a claimant to prove a disability.[5] And the record does include the conclusions of treating physicians that Chamness has focus, concentration, and memory problem secondary to depression and anxiety after May 2011. Finally, the Sixth Circuit has observed that mental health problems are typically not diagnosed or supported by objective medical tests.

Fourth, the Court places no weight on Chamness's argument that the American Psychiatric Association considers it unethical for a psychiatrist to offer a professional opinion without first having examined or treated the patient. (Brief at 17 PageID.954.) The provision of the Principles of Medical Ethics cited by Chamness refers to situations where psychiatrists are asked for an opinion about an individual who is in the public light or who has publically disclosed things about himself or herself. (ECF No. 19-1 Ex. A to Liberty's Brief PageID.1001.)

Finally, because this Court concludes the record supports Chamness's claim for mental disability, and not his claim for a physical disability, the long term benefits are limited to twenty-four months. To the extent Chamness believes he is entitled to benefits because

---

[5] The Plan defines "proof" as "evidence in support of a claim for benefits and includes, but is not limited to, the following:" (1) a claim form, (2) the attending physician's statement, and (3) the provision of the attending physician for standard diagnosis, chart notes, "and/or other forms of objective medical evidence in support of a claim for benefits." (ECF No. 11-1 PageID.53.) The Plan does include objective medical evidence as a type of proof. "Proof," however, is defined as including those types of proof, but not limited to those types. To the extent that Liberty required Chamness to provide objective proof of memory loss, Liberty would need to put Chamness on notice of that requirement, which they did not do. *See, e.g., Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 661 (6th Cir. 2013) (noting that the initial denial letter concluded that the record lacked objective medical evidence to support the disability claim, which put the claimant on notice as to what would be required for the claim to be approved on an appeal).

he is unable to perform the duties of "any occupation," Liberty Life has not been asked to provide those benefits and the Court has no occasion to review a decision that has not yet been rendered.

IV.

The Court has performed a de novo review of Liberty Life's denial of Chamness's claim for long term disability benefits. The record supports Liberty Life's decision to deny benefits based on a physical disability. No doctor has concluded that Chamness's physical maladies prevent him from performing the duties of his own occupation. The record does not support Liberty Life's decision to deny benefits based on a mental disability. Chamness's treating psychiatrist concluded that he was unable to work as a doctor because his depression and anxiety affected his mental abilities to focus, concentrate, and remember. The consulting psychiatrist, who met with Chamness, reached the same conclusion. The psychiatrists on which Liberty Life relies did not meet with or examine Chamness. And the Sixth Circuit has held that file reviews for mental health situations are "particularly questionable." The file reviewers insufficiently or inadequately accounted for the evidence that Chamness's depression and anxiety were affecting his mental faculties. And, those mental faculties are essential to being able to perform the duties of his occupation.

## ORDER

For the reasons provided in the accompanying Opinion, the Court reverses Liberty Life's decision that Dr. James Chamness was not entitled to long term disability benefits for a mental disability. Chamness has established that he is entitled to long term disability benefits for a mental health disability.

**IT IS SO ORDERED.**


Date:  February 16, 2017               /s/ Paul L. Maloney
                                      Paul L. Maloney
                                      United States District Judge